# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| THERESA WHITE, | ) | CASE NO. 1:16CV1021 |
| | ) | |
| Plaintiff, | ) | JUDGE DAN AARON POLSTER |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |

Plaintiff, Theresa White ("Plaintiff" or " White"), challenges the final decision of

Defendant, Nancy A. Berryhill,[1] Acting Commissioner of Social Security ("Commissioner"),

denying her applications for Period of Disability ("POD"), Disability Insurance Benefits

("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social

Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This Court has jurisdiction

pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate

Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and

Recommendation.  For the reasons set forth below, the Magistrate Judge recommends that the

Commissioner's final decision be AFFIRMED.

---

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social
Security.

1

# I.  PROCEDURAL HISTORY

In January 2013, White filed applications for POD, DIB, and SSI, alleging a disability onset date of July 1, 2012 and claiming she was disabled due to psoriatic arthritis in both hands and wrists, high blood pressure, psoriasis on her hands and feet, asthma, severe sleep apnea, depression and anxiety.  (Transcript ("Tr.") 51, 200, 230.)  The applications were denied initially and upon reconsideration, and White requested a hearing before an administrative law judge ("ALJ").  (Tr. 51, 148-154, 164-171.)

On January 28, 2015, an ALJ held a hearing, during which White, represented by counsel, and an impartial vocational expert ("VE") testified.  (Tr. 68-97.)  On April 16, 2015, the ALJ issued a written decision finding White was not disabled.  (Tr. 51-62.)  The ALJ's decision became final on March 22, 2016, when the Appeals Council declined further review.  (Tr. 1-5.)

On April 28, 2016, White filed her Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 12, 14.)  White asserts the following assignments of error:

    (1)    The ALJ failed to give appropriate weight to the opinion of the treating physicians, relying instead on outdated opinions of non-treating, non-examining physicians.

    (2)    The ALJ's assessment of residual functional capacity is without the support of substantial evidence.

(Doc. No. 12.)

# II.  EVIDENCE

## A.  Personal and Vocational Evidence

White was born in February 1961 and was fifty-three (53) years old at the time of her administrative hearing, making her a person closely approaching advanced age under social

2

security regulations.  (Tr. 200.)  *See* 20 C.F.R. §§ 404.1563(d) & 416.963(d).  She has a high

school education and two years of college, and is able to communicate in English.  (Tr. 913.)

She has past relevant work as a sales representative/telemarketer.  (Tr. 61-62.)

**B.      Relevant Medical Evidence**

White suffers from a number of chronic health conditions, including psoriasis, arthritis,

obesity, obstructive sleep apnea, hypertension, diabetes, and hyperlipidemia.  The parties direct

this Court's attention to the following medical evidence in the record.[2]

In February 2006, White underwent x-rays of her bilateral hands, which revealed the

following: (1) degenerative changes in the first metacarpal-phalangeal joint and first carpal-

metacarpal joint of the left hand; and (2) degenerative changes in the first metacarpal-phalangeal

joint of the right hand manifested by joint space narrowing and osteophytosis.  (Tr. 354.)  The

radiologist interpreted these x-rays as "most suggestive of crystal deposition arthropathy."  (*Id.*)

In May 2012, White presented to primary care physician Anita Redahan, M.D., for

follow-up evaluation of her morbid obesity, psoriasis, hypertension, hyperlipidemia, and sleep

disorder.  (Tr. 902-906.)  She weighed 367 pounds and had a Body Mass Index ("BMI") of 64.

(Tr. 902.)  Examination revealed psoriasis, but no edema or calf tenderness.  (Tr. 904.)  Dr.

Redahan advised White to schedule a sleep study, and continue her physical therapy and

medications for joint pain.  (*Id.*)

On June 27, 2012, White presented to Uzma Syeda, M.D., for evaluation of her arthritis.

(Tr. 885-890.)  She complained of pain in both hands, her left wrist, both knees, and her right

---

[2] The medical record in this matter is quite voluminous.  The Court's recitation of
the evidence is not intended to be exhaustive, and is limited to the medical evidence
identified in the parties' Briefs.

hip.  (Tr. 885.)  White stated she had suffered from psoriasis for "about 10 years," and complained of increasing joint pains over the past two years, particularly in her hands and wrists. (Tr. 886.)  She also complained of three hours of morning stiffness in her joints.  (*Id*.)  White stated she had been on Humira since January 2011 and that it had helped her psoriasis skin lesions but "does not seem to help with the joint pain."  (Tr. 885-886.)  She also reported participating in physical therapy for her knee pain.  (Tr. 885.)

White's blood pressure was elevated at 191/94, and she weighed 375 pounds.  (Tr. 886.) On examination, Dr. Syeda noted morbid obesity, "peeling skin/psoriasis of palms," thickened and tender proximal interphalangeal joints ("PIP"), left de Quervain's tendinitis with positive Finkelstein's maneuver, right trochanteric tenderness, bony enlargement of the knees with crepitus and no effusion, and "multiple tender points."  (Tr. 886-887.)  Dr. Syeda noted physical therapy had helped with White's left shoulder pain, but that her left wrist/thumb pain continued. (Tr. 887.)  She also noted White "did not use the thumb spica splint as previously suggested." (*Id.*)

Dr. Syeda diagnosed radial styloid tenosynovitis, trochanteric bursitis, and psoriasis/arthritis.  (Tr. 887.)  She referred White to occupational therapy for a thumb splint, advised her to follow up with weight management, and administered a steroid injection in her hip.  (*Id*.)  In addition, Dr. Syeda ordered x-rays of White's bilateral knees, which showed (1) moderate to severe degenerative changes of the patellofemoral joint bilaterally with narrowing and spurring from the posterior aspect of the patella; and (2) mild degenerative changes right greater than the left.  (Tr. 891, 907.)

On August 9, 2012, White presented to dermatology resident Jeremy Davis, M.D., for

4

evaluation of her psoriasis.  (Tr. 874-879.)  Dr. Davis noted White was currently being treated for her plaque psoriasis with Clobetasol ointment, lidex solution, and Humira.  (Tr. 874.)  White indicated she was satisfied with her current treatment, did not wish to make any changes, and had no other skin concerns at that time.  (*Id.*)  Examination revealed "numerous discrete pustules and erythematous plaques involve the palms and dorsal hands, bilaterally."  (Tr. 876.)  Dr. Davis diagnosed psoriasis, plaque type, noting it involved 2-3% of White's Body Surface Area ("BSA").  (Tr. 877.)  He advised White to continue with her treatment regimen.  (*Id.*)

Later that month, on August 25, 2012, White returned to Dr. Redahan for follow up of her various impairments.  (Tr. 868-872.)  White reported a flare up in her psoriasis and indicated she had not yet made an appointment for a sleep study.  (Tr. 868.)  She did indicate, however, that her trochanteric bursitis had "greatly improved" since the steroid injection.  (*Id.*)  On examination, Dr. Redahan noted elevated blood pressure, morbid obesity, and diffuse psoriasis, but no edema or calf tenderness.  (Tr. 870.)  She prescribed Tylenol Arthritis for White's joint pain, advised her to "work on her weight," and encouraged her to schedule a sleep study.  (Tr. 870, 872.)

On September 27, 2012, White presented to Khalid Elamin, M.D., for treatment of her arthritis.  (Tr. 854-858.)  White reported significant improvement with the right hip injection, but "felt her psoriasis plaques and arthritis in her hands have become worse and attributed it to her injections."  (Tr. 854.)  She complained of pain in her left shoulder and bilateral knees, and stated she did not buy a thumb splint because she could not afford it.  (*Id.*)  White's blood pressure was 142/93 and she weighed 356 pounds.  (Tr. 857.)

On examination, Dr. Elamin noted "extensive plaques on both hands, pitting and ridges

5

in all nails," joint thickening at PIP, and hand and wrist tenderness.  (Tr. 857.)  He observed full

range of motion in White's knees with no tenderness, but did note positive findings for crepitus.

(*Id*.)  He assessed (1) psoriasis and psoriasis arthropathy; (2) right trochanteric bursitis; (3)

deQuervain tendonitis; and (4) osteoarthritis of both knees.   (Tr. 858.)  Additionally, Dr. Elamin

administered steroid injections to White's knees.[3]  (*Id*.)

On that same date, White presented to rheumatologist Sobia Hassan, M.D., for evaluation

of her psoriatic arthritis.  (Tr. 858-863.)  White complained of pain in her knees, hands, and left

thumb.  (Tr. 859.)  On examination, Dr. Hassan noted morbid obesity, psoriasis of both hands,

pitting and ridging of the nails, tenderness in hand joints, left deQuervain's tendinitis with

positive Finkelstein's maneuver, and tender wrists.  (Tr. 860.)  She also noted bony enlargement

of the knees with crepitus and bilateral warmth and tenderness but no effusion.  (*Id*.)  Dr. Hassan

assessed psoriasis with psoriatic arthritis and osteoarthritis in the knees.  (Tr. 862.)

Thereafter, on October 25, 2012, White underwent a sleep study due to reports of

excessive daytime sleepiness, not feeling refreshed after sleep, and difficulty falling asleep.  (Tr.

847.)  Joseph A. Golish, M.D., interpreted the Diagnostic Polysomnography Report as showing

severe obstructive sleep apnea with hypoxemia that was disproportionate to the severity of her

sleep apnea.  (Tr. 849.)  Dr. Golish recommended a CPAP Titration Sleep Study and advised

White to be cautious when driving and operating heavy machinery.  (Tr. 850.)

On November 11, 2012, White returned to dermatology resident Dr. Davis for follow up

regarding her psoriasis.  (Tr. 842-845.)  She reported "flares of symptoms on hands and feet

---

[3] On September 27, 2012, Dr. Elamin wrote a letter on White's behalf, certifying that she
had psoriasis arthropathy involving both wrists and small joints of both hands with
superimposed osteoarthritis.  (Tr. 773.)

6

following injections of kenalog to hip joints for osteoarthritis," but was otherwise "doing well." (Tr. 842.)  Dr. Davis noted "confluent erythematous plaques involving the dorsal hands and feet with interspersed hyperpigmented patches and adherent thin white scale." (Tr. 843.)  He diagnosed psoriasis, plaque type, and noted involvement of  2 to 3% BSA. (*Id*.)  Dr. Davis advised White to continue her current treatment regimen, including Humira. (*Id*.)

Later that month, on November 28, 2012, White presented to primary care physician Dr. Redahan for follow-up of her various impairments. (Tr.  836-841.)  Dr. Redahan noted White was not exercising and not willing to work with a nutritionist. (Tr. 836.)  White's blood pressure was 150/90 and she weighed 372 pounds with a BMI of 65.98. (*Id*.)  She complained of depression, including poor energy and motivation. (*Id*.)  On examination, Dr. Redahan noted White appeared depressed and irritable. (Tr. 838.)  She diagnosed depression, prescribed Zoloft, and stated a psychiatry referral would be considered if White did not improve. (*Id.*)  Dr. Redahan also increased White's blood pressure medication, and encouraged her to work with a nutritionist. (Tr. 838, 840.)

That same day, White also presented to rheumatologist Dr. Hassan. (Tr. 828-832.)  White reported her knee pain had improved since the injections; however, she experienced a flare of her psoriasis. (Tr. 829.)  She complained of lateral right thigh/buttock pain, fatigue, and anxiety. (*Id*.)  On examination, Dr. Hassan noted psoriasis on White's palms and feet, pitting and ridging on her nails, but no swelling or tenderness of her hands and wrists. (Tr. 829-830.)  She also observed bony enlargement of White's knees with crepitus and bilateral mild warmth and tenderness but no effusion. (Tr. 830.)  She advised White to continue her Humira and stressed the importance of weight loss. (Tr. 832.)

7

White returned to Dr. Redahan on January 8, 2013.  (Tr. 798-802.)  Dr. Redahan noted White had failed to make an appointment with the nutrition clinic.  (Tr. 798.)  White's blood pressure was 150/78 and she weighed 369 pounds for a BMI of 65.43.  (*Id*.)  Dr. Redahan noted no edema in White's legs or calf tenderness.  (Tr. 800.)  She increased White's blood pressure medication and "strongly recommended" that White work with a nutritionist to assist with weight loss.  (Tr. 802.)

On February 20, 2013, White presented to Dr. Hassan with complaints of pain in her right lateral thigh/buttocks region.  (Tr. 790-796.)  White requested a trochanteric steroid injection to the area because the last one had provided relief for more than five months.  (Tr. 791.)  On examination, Dr. Redahan noted White had lost 20 pounds, bringing her BMI to 61.7.  (Tr. 790-791.)  She observed psoriasis in both of White's hands; pitting, ridging and onycholysis in her nails; some joint tenderness in her hands but no swelling of her "actual joints" or wrists; tenderness in her left shoulder and hips; and bony enlargement in her knees with crepitus but not effusion, warmth, or tenderness.  (Tr. 792-793.)  Dr. Hassan administered a right trochanteric steroid injection.  (Tr. 794.)  She described White's psoriasis as stable and advised her to continue her medication.  (Tr. 791, 794.)  She also encouraged White to continue losing weight. (Tr. 794.)

Shortly thereafter, White presented to Dr. Davis for follow up regarding her plaque psoriasis.  (Tr. 786-789.)  Dr. Davis noted (1) confluent erythematous plaques with adherent thin white plaques involving the dorsal hands to distal dorsal wrists, bilaterally; and (2) a few discrete erythematous papules with adherent dry scale involving the scalp. (Tr. 786-787.)  He estimated 3 to 4 % BSA involvement.  (Tr. 787.)  Dr. Davis found White's psoriasis remained

under "good control" except for her hands and scalp, "which are normally kept under reasonable control with topical meds."  (Tr. 786.)  He noted White was doing well on Humira, but considered changing her to Stelara "due to weight-based dosing." (Tr. 787.)

Later that month, White presented for a sleep medicine follow-up with certified nurse practitioner Valerie Ross.  (Tr. 778-782.)  White reported tolerating the CPAP machine and wearing "nasal pillow interface" for approximately 3 hours per night, between four and seven days per week.  (Tr. 778.) On examination, White had a normal gait and mild lower extremity edema.  (Tr. 782.)  Ms. Ross recommended Holter Monitor testing and advised White to lose weight.  (*Id.*)  She noted that White was "refusing referral to Weight Management" on the grounds she was "too busy."  (*Id*.)

On May 22, 2013, White underwent another sleep study (titration polysomnography with oxygen) due to her continued sleep problems.  (Tr. 956-959.)  White's sleep apnea responded to the CPAP at 16 cm H2O; however, "due to ongoing steady hypoxia on this setting, oxygen at 1 [liter/minute] is recommended with the CPAP."  (Tr. 959.)  The reviewing physician also noted that "dramatic weight loss is imperative" for White's long term health.  (*Id*.)

White returned to Dr. Hassan on May 31, 2013.  (Tr. 943-945.)  She reported the right trochanteric injection had helped for about six weeks, and that her joints were currently doing "okay."  (Tr. 944.)  White indicated she had "good and bad days," however, and continued to experience pain in her knees and lateral right thigh.  (*Id*.)  On examination, Dr. Hassan noted " a few plaques" on White's palms, pitting in her nails, full muscle strength in all four limbs, no edema, and bony enlargement of both knees with crepitus but no effusion.  (*Id*.)  Dr. Hassan noted that "most of [White's] joint pains appear related to osteoarthritis rather than" psoriatic

arthritis.  (Tr. 945.)  She advised White to continue with her medication, and stressed the importance of weight loss.  (*Id*.)

That same day, White also presented to rheumatologist Mohammad Hussain, M.D.  (Tr. 945-950.)  White reported taking Tylenol Arthritis two to three times per week for her joint pain.  (Tr. 946.)  She complained of bilateral wrist pain, and morning stiffness lasting about five minutes.  (*Id*.)  On examination, Dr. Hussain noted psoriasis in both White's hands; hyperpigmentation in her wrists, hands, and fingers; joint pain mostly in her wrist and hip; and no edema in her extremities.  (Tr. 948-949.)  He also noted full muscle strength in White's hands, intact sensation, and normal gait.  (Tr. 949.)

On July 8, 2013, White underwent an arterial blood gas interpretation, which showed (1) mild hypercapnia likely due to a mild mixed respiratory acidosis and metabolic alkalosis; and (2) mild hypoxemia.  (Tr. 939.)  Shortly thereafter, White presented to Dr. Redahan with complaints of ongoing pain in her hands, back and knees.  (Tr. 1112-1118.) White reported her psoriasis was under poor control, and that she had difficulty standing and walking "for any significant duration" and difficulty using her hands due to pain.  (Tr. 1112.)  Dr. Redahan noted active psoriasis; hand, knee and back pain; antalgic gait; and no edema or calf tenderness.  (Tr. 1114-1115.)  She diagnosed hypertension, hyperlipidemia, morbid obesity, psoriasis, osteoarthritis, and obstructive sleep apnea.  (Tr. 1115.)  Dr. Redahan again counseled White to see a nutritionist and, while she was initially reluctant, White agreed to be seen in the Weight Management Clinic "for assessment and consideration of bariatric surgery."  (Tr. 1112.)  In addition, Dr. Redahan increased White's blood pressure medication and prescribed Tramadol as needed for "more severe pain."  (Tr. 1117.)

10

On July 29, 2013, Dr. Redahan completed a Medical Source Statement regarding White's Physical Capacity.  (Tr. 1016-1017.)  She opined White could (1) lift and carry no more than 10 pounds occasionally and 5 to 10 pounds frequently; (2) stand/walk for no more than 15 to 20 minutes at a time for a total of no more than 2 hours in an 8 hour workday; and (3) sit for 1 hour at a time for a total of no more than 4 to 8 hours in an 8 hour workday.  (Tr. 1016.)  Dr. Redahan further concluded White could only rarely climb, balance, stoop, crouch, kneel and crawl; and occasionally reach, push/pull, and engage in fine and gross manipulation.  (Tr. 1016-1017.)  She also found White had environmental restrictions for heights, moving machinery, temperature extremes, and pulmonary irritants.  (Tr. 1017.)  Dr. Redahan stated White experienced moderate to severe pain from her chronic pain disorder, and indicated she would need to elevate her legs to 45 degrees at will.  (*Id*.)

On September 9, 2013, White presented to sleep medicine for a follow-up visit regarding her sleep apnea.  (Tr. 1121-1127.)  She reported not using her CPAP because the mask was not fitting well.  (Tr. 1123, 1125.)  Examination revealed normal gait, and mild lower extremity edema, cyanosis, or clubbing.  (Tr. 1125.)  Ms. Ross indicated she would attempt to find a different mask for White, with the goal of White using the CPAP nightly for at least four to six hours.  (*Id*.)  On that same date, White underwent a chest x-ray, which showed (1) mild cardiac enlargement; and (2) degenerative changes in the spine with some marked interval worsening. (Tr. 1128.)

On October 9, 2013, White presented to the Weight Management Clinic for "evaluation for gastric bypass appropriateness/readiness and Medical management of co-morbid problems through weight loss."  (Tr. 1139-1154.) She reported pain in her bilateral knees, hand numbness,

11

and depression.  (Tr. 1141, 1144.)  White's blood pressure was 154/94 and she weighed 372 pounds for a BMI of 65.9.  (Tr. 1145.)  Examination revealed "dry and intact skin," and no lower extremity edema.  (*Id*.)  She was advised to use her CPAP consistently and make "healthy lifestyle changes," including modifying her diet and exercising.  (Tr. 1147.)

On October 18, 2013, White returned to Dr. Redahan, with complaints of pain below the right shoulder blade and in the lateral aspect of right abdomen "for months."  (Tr. 1156-1163.) She also indicated she was not wearing her CPAP nightly because the mask was uncomfortable. (Tr. 1156.)  Dr. Redahan ordered an ultrasound of White's liver, which she underwent that same day.  (Tr. 1159, 1164.)  The ultrasound revealed "markedly enlarged liver with moderate to severe steatosis, which severely limits evaluation for focal abnormalities."  (Tr. 1164.)  Several days later, on October 23, 2013, White underwent an Exercise Oximetry Study, which showed she did not require supplemental oxygen at rest or with low level activity; however, her pulmonary function studies did show moderate obstructive ventilatory impairment with gas trapping and reduced diffusion capacity.  (Tr. 1166-1167.)  The Study also noted that White "only walked 2 minutes and stopped due to pain in her knees and hip."  (*Id*.)

On October 31, 2013, White returned to Dr. Hassan for follow up of her joint pain and arthritis.  (Tr. 1172-1179.)  She complained of pain and swelling in her hands, as well as pain in her right shoulder, right lateral thigh/posterior buttocks.  (Tr. 1172.)  Dr. Hassan noted White's "psoriasis on palms and soles not under good control. Dermatologists are thinking of changing her to Stelara."  (*Id*.)  Examination revealed plaques on White's palms and soles; pitting, ridging, and onycholysis in her nails; "power 5/5 in all 4 limbs;" no edema; tenderness and slight swelling of PIPs and few MCPs; and joint line tenderness and bony hypertrophy in her knees.

(Tr. 1173.)  Dr. Hassan found that "some of [White's] joint pains are from [osteoarthritis] (knees) but she does also have more [hand joint] tenderness today that may be related to psoriatic arthritis."  (Tr. 1174.)  She agreed with the dermatologist's plans to change White's medication from Humira to Stelara.  (*Id*.)

White returned to the Weight Management Clinic on December 10, 2013, where it was noted she had lost 12 pounds since her last visit but was using her CPAP "very infrequently." (Tr. 1189.)  On December 18, 2013, White returned to Dr. Davis for follow up of her psoriasis. (Tr. 1199-1200.)  Examination revealed thickened hyperpigmented plaques on White's palms and soles.  (Tr. 1199.)  Dr. Davis noted White had been approved for Stelara and was hopeful her palmoplantar psoriasis would improve with the medication change.  (Tr. 1199-1200.)

On January 13, 2014, White presented to Jalvidaya Dasarathy, M.D., for follow-up regarding the results of her liver ultrasound.  (Tr. 1205-1215.)  White complained of fatigue. (Tr. 1205.)  Dr. Dasarathy noted White had recently been diagnosed with fatty liver disease. (*Id*.)  Extremity exam was normal without edema or calf tenderness.  (Tr. 1207.)  Dr. Dasarathy recommended lifestyle modification, including dietary counseling and aerobic exercise.  (Tr. 1209.)  Several days later, White returned to the Weight Management Clinic, where it was noted that she had lost an additional seven pounds since her last visit.  (Tr. 1216.)  At that time, she weighed 353 pounds for a BMI of 62.55.  (Tr. 1218.)  Examination revealed 5/5 muscle strength. (*Id*.)

Later that month, on January 20, 2014, White presented to sleep medicine for a follow-up regarding her sleep apnea.  (Tr. 1226-1234.)  She reported: "I cannot use the CPAP at that high pressure– the mask balloons out and I can't wear it."  (Tr. 1226.)  Ms. Ross decreased the CPAP

13

pressure and advised White to wear it nightly for at least 4 to 6 hours per night.  (Tr. 1229.)

On January 28, 2014, White transferred her primary care from Dr. Redahan to Martin Ryan, M.D.  (Tr. 1235-1244.)  White's blood pressure was under good control at 120/62, and she weighed 355 pounds for a BMI of 62.97.  (Tr. 1235.)  Dr. Ryan noted that White was shown as having elevated random blood sugars recently.  (*Id*.)  Examination revealed no lower extremity edema.  (Tr. 1236.)

On February 7, 2014, White returned to Dr. Davis for follow up regarding her psoriasis.  (Tr. 1245-1250.)  White had started Stelara one month previously.  (Tr. 1245.)  She reported moderate improvement in her symptoms, and indicated "no new skin concerns since the previous visit."  (*Id*.)  Examination revealed "few hyperpigmented plaques with mild erythema involving the palms, dorsal hands, elbows, and knees."  (Tr. 1246.)  Dr. Davis advised White to continue with the Stelara.  (*Id*.)

On that same date, White presented to Dr. Hassan for follow up regarding her arthritis.  (Tr. 1251-1258.)  White reported she was off Humira for three or four weeks before starting Stelara and "noticed worsening of her hand pains during that time."  (Tr. 1251.)  Since taking Stelara, her pain has "started to get a little better . . . but still painful."  (*Id*.)  White also complained of ongoing knee and left shoulder pain, and morning stiffness lasting 15 to 20 minutes.  (Tr. 1252.)  Examination revealed plaques on her palms and soles ("less than last visit"); pitting, ridging, and onycholysis in her nails; no edema; tenderness of her hand joints and left wrist; tenderness and slightly reduced range of motion in her left shoulder; and joint tenderness and bony hypertrophy in her knees, with crepitus.  (Tr. 1254.)  Dr. Hassan advised White to continue with the Stelara, as her "joint pains are slowly improving now."  (Tr. 1255.)

14

On February 19, 2014, White presented to the Diabetes Clinic, feeling "overwhelmed with the diagnosis of diabetes."  (Tr. 1259-1264.)  She was provided diabetes education and encouraged to take classes, which she declined.  (Tr. 1261.)  Several weeks later, White returned to the Weight Management Clinic, where it was noted she had lost 2.5 pounds since her last visit and a total of 21.5 pounds since October 2013.  (Tr. 1270.)  White continued to report difficulty tolerating the CPAP machine.  (Tr. 1266.)  During a visit with sleep medicine on March 17, 2014, however, White indicated she was able to tolerate the CPAP and was "wearing full face mask interface approximately 3-4 hours/night 3/7 days per week."  (Tr. 1278.)  At that visit, Ms. Ross noted normal gait but moderate lower extremity edema.  (Tr. 1281.)

On March 28, 2014, White returned to the Diabetes Clinic, where it was noted her blood sugars had declined "though many readings still borderline target."  (Tr. 1289.)  It was also noted that White "is steadily losing weight, appears somewhat overwhelmed, encouraged current changes and will follow up at next series of classes."  (Tr. 1289.)  On that same date, White presented to Dr. Ryan, who indicated her "home sugars show gradual improvement in values."  (Tr. 1294.)  Dr. Ryan performed a foot examination, which showed normal pulses bilaterally, normal sensory exam, psoriatic plaques bilaterally, and crumbling, discolored nails bilaterally.  (Tr. 1295.) White presented to the Liver Clinic that same day, where she complained of fatigue.  (Tr. 1303-1314.)  Examination of her extremities was normal "without edema or calf tenderness."  (Tr. 1306.)

The following month, on April 24, 2014, White returned to the Weight Management Clinic.  (Tr. 1315-1326.)  Her blood pressure was well controlled, at 126/80, and her weight was 332 pounds for a BMI of 58.91.  (Tr. 1315.)  White reported exercising on her bike and Wii.  (Tr.

15

1318.)  It was noted that White had lost 18 pounds since her last visit, and a total of 39.5 pounds since October 2013.  (Tr. 1321-1322.)

On May 1, 2014, White returned to Dr. Hassan for follow-up regarding her arthritis.  (Tr. 1327-1334.)  White reported she had had her third Stelara injection and "really likes this medication," stating it "is helping her psoriasis skin lesions to clear up."   (Tr. 1328.)  She did complain, however, of ongoing knee and thigh pain, mainly with prolonged walking.  (*Id*.) White also reported continuing hand pain, although she did "think that her joint pains are slightly better controlled" on Stellara.  (*Id*.)  Finally, White complained of "burning pain" in her feet.  (*Id*.) Examination revealed hyperpigmentation of White's hands and forearms with clearing of previous psoriasis plaques; pitting, ridging, and onycholysis in her nails; no edema in her extremities; tenderness in her hand joints and wrist; slightly reduced range of motion in her shoulders; no tenderness or swelling in her ankles; and joint line tenderness and bony hypertrophy in her knees with crepitus.  (Tr. 1330.)  Dr. Hassan noted White "is much happier on [Stelara] compared to Humira" and "her skin disease has improved and hand pains may be slowly improving."  (Tr. 1331.)  She further indicated White's knee and lower back pains were likely due to osteoarthritis.  (*Id*.)  Dr. Hassan advised White to continue with Stelara and use Tylenol as necessary.  (*Id*.)

Later that month, on May 27, 2014, White presented to Dr. Davis for follow up regarding her psoriasis.  (Tr. 1353-1354.)  On examination, Dr. Davis noted "few hyperpigmented plaques with mild erythema involving the palms."  (Tr. 1353.)  He diagnosed plaque psoriasis with palmoplantar involvement and indicated White was "doing very well."  (*Id*.)  On June 4, 2014, White returned to primary care physician Dr. Ryan.  (Tr. 1358-1362.)  White's blood pressure

16

was well-controlled, at 124/62, and she weighed 328 pounds for a BMI of 58.28.  (Tr. 1358.)

Examination revealed no edema.  (Tr. 1359.)  Dr. Ryan diagnosed diabetes mellitus type 2,

psoriasis, hypertension, morbid obesity, hyperlipidemia, obstructive sleep apnea, and fatty liver.

(*Id*.)

      White returned to Weight Management on June 6, 2014.  (Tr. 1363-1370.)  Treatment

notes indicate she could not tolerate her CPAP, and was no longer taking Zoloft for her

depression.  (Tr. 1363-1364.)  She continued to use her bike and Wii for exercise, and was found

to have full muscle strength.  (Tr. 1364, 1366.)  White was noted to have lost 7.5 pounds since

her last visit, and a total of 47 pounds since October 2013.  (Tr. 1368.)

      Several days later, on June 11, 2014, White began treatment with podiatrist Sean

McMillin, DPM, for evaluation of "painful, thickened, and elongated toenails."  (Tr. 1371-1375.)

On examination, Dr. McMillin noted edema, protective sensation, full muscle strength, reduced

painfree range of motion of the ankle joint, and no pain on palpation to the foot.  (Tr. 1374.)

With regard to White's toenails, he noted "Nails 1-10 are thickened, discolored elongated with

subungual debris," but no open ulcers, corns, erythema or signs of infection.  (*Id*.)  Dr. McMillin

also observed psoriatic plaques at various locations, mostly medial feet/arches.  (*Id*.)  He

recommended periodic debridement.  (*Id.*)

      On July 28, 2014, White returned to Weight Management.  (Tr. 1376-1383.)  White's

blood pressure was 116/76 and she weighed 321 pounds, for a BMI of 56.97.  (Tr. 1376.)  She

reported having fallen while biking outside, and "has not exercised since."  (*Id*.)  White did,

however, state that she had been walking more.  (Tr. 1376-1377.)  Treatment notes indicate

White's blood sugars were improving and that she had lost 3.5 pounds since the last visit, for a

total of 50.5 pounds.  (Tr. 1377, 1381.)

On August 6, 2014, White returned to Dr. Ryan, with complaints of hemmorhoidal irritation.  (Tr. 1386-1388.)  She also reported she had not been using her CPAP regularly.  (Tr. 1386.)  Examination revealed no edema.  (Tr. 1387.)

White thereafter presented to Dr. Hassan on September 5, 2014.  (Tr. 1389-1394.)  White reported Stelara had helped with her psoriasis and made "some difference" with respect to her hand pain.  (Tr. 1389.)  She did not, however, believe it had made a difference with respect to her knee or right lateral thigh pain.  (*Id*.)  White reported morning stiffness in her hands lasting 10 minutes, but stated she was overall feeling better since losing weight.  (*Id*.)  On examination, Dr. Hassan noted hyperpigmentation of hands and forearms with clearing of previous psoriasis plaques; pitting, ridging, and onycholysis of the nails; no edema; no hand joint or wrist tenderness; slight reduced range of motion of the shoulders; right lateral trochanteric region tenderness; joint line tenderness and bony hypertrophy of the knees with crepitus; and no ankle tenderness or swelling.  (Tr. 1392.)  Dr. Hassan advised White to continue taking Stelara.  (Tr. 1394.)

On September 26, 2014, White presented to Jeremy Lipman, M.D., with complaints of anal pain. (Tr. 1400-1405.)  She complained of blood in her stool, and reported "bowel movements feel like she is 'passing glass.'"  (Tr. 1401.)  Dr. Lipman assessed anal fissure, and prescribed lidocaine and Nifedipine.  (Tr. 1404.)

On October 9, 2014, White returned to the Diabetes Clinic, where it was noted her blood sugar levels were 97% within target range.  (Tr. 1406.)  That same day, White presented to Dr. Ryan.  (Tr. 1407-1410.)  She reported she had stopped taking her diabetes medication,

Metformin, over the past few weeks and had continued to have good home sugars. (Tr. 1407.) White felt she "can not control this with diet alone." (*Id*.) Dr. Ryan also noted White had not been compliant with her CPAP machine, noting "again [she] feels she can improve this with weight loss alone." (Tr. 1409.)

Several weeks later, on October 29, 2014, White presented to dermatology resident Eric Wilkerson, M.D., for follow up regarding her psoriasis. (Tr. 1411-1413.) She stated Stelara kept her "skin well under control and psoriatic arthritis much improved and under control." (Tr. 1411.) She did note some worsening on her hands, feet, and nails "when it is nearly time for the injection again," and complained that her feet were "difficult to walk on." (*Id*.) On examination, Dr. Wilkerson found (1) hyperpigmentation scaling plaques on dorsal hands; and (2) thick hyperpigmented scaling plaques on lateral, medial and plantar feet, right worse than left. (Tr. 1412.) He noted White's psoriasis/psoriatic arthritis was "overall well controlled on Stelara but does flare at times." (*Id*.)

On November 7, 2014, White returned to Dr. Lipman and reported limited improvement with her anal pain. (Tr. 1414.) White subsequently underwent an anal exam and biopsy under anesthesia, which revealed vulvovaginal plaques. (Tr. 1450-1451.) White was diagnosed with lichenoid dermatitis. (Tr. 1458.)

On December 11, 2014, White returned to the Diabetes Clinic, where it was found her blood sugar levels were 100% within target range. (Tr. 1471.) On that same date, White presented to Dr. Ryan, with complaints of joint and low back pain "that limits her ability to exercise." (Tr. 1476.) Her blood pressure was 133/74 and she weighed 305 pounds for a BMI of 54.12. (*Id*.) Dr. Ryan noted White's diabetes was under "good control off medication." (Tr.

1477.)

On December 19, 2014, Dr. Ryan completed a Medical Source Statement regarding White's Physical Capacity.  (Tr. 1489-1490.)  Dr. Ryan indicated White's abilities to lift/carry and stand/walk were affected by her impairments, but did not assess any specific functional limitations.  (*Id*.)  He determined her ability to sit was not affected by her impairments, but found she could (1) rarely climb, balance, stoop, crouch, kneel, and crawl; (2) occasionally reach, and push/pull; and (3) frequently engage in fine and gross manipulation.  (*Id*.)  Dr. Ryan did not assess any environmental restrictions.  (*Id*.)  Dr. Ryan also indicated White would not need to elevate her legs at will, or the ability to alternate positions between sitting, standing and walking. (*Id.*)  Finally, Dr. Ryan opined White suffered from moderate pain that interfered with her concentration, took her off task, and would cause absenteeism.  (*Id*.)  Dr. Ryan identified "x-rays showing mod-severe [degenerative joint disease] of knees bilaterally and morbid obesity" as the medical findings that supported his assessment.  (*Id.*)

**C.     State Agency Reports**

On April 25, 2013, state agency physician Jan Gorniak, D.O., reviewed White's medical records and completed a Physical Residual Functional Capacity ("RFC") Assessment.  (Tr. 106-108.)  Dr. Gorniak opined that White could (1) lift and carry 20 pounds occasionally and 10 pounds frequently; (2) stand and/or walk for about 6 hours in an 8 hour workday; and (3) sit for about 6 hours in an 8 hour workday.  (Tr. 107.)  He further found White could (1) never climb ladders, ropes or scaffolds, or crawl; (2) occasionally climb ramps and stairs, kneel, and crouch; and (3) frequently balance and stoop.  (*Id*.)  Dr. Gorniak concluded White had unlimited push/pull capacity and no manipulative limitations.  (Tr. 107-108.)  Finally, Dr. Gorniak found

20

White should avoid all exposure to hazards (machinery, heights, etc.) and avoid concentrated exposure to extreme cold and heat, humidity, fumes, odors, dusts, gases, and poor ventilation. (Tr. 108.)

On August 26, 2013, state agency physician Eli Perencevich, D.O., reviewed White's medical records and completed a Physical RFC Assessment.  (Tr. 141-143.)  Dr. Perencevich found White could (1) lift and carry 20 pounds occasionally and 10 pounds frequently; (2) stand and/or walk for about 2 hours in an 8 hour workday; and (3) sit for about 6 hours in an 8 hour workday.  (Tr. 142.)  He further found White could (1) never climb ladders, ropes or scaffolds, or crawl; (2) occasionally climb ramps and stairs, kneel, and crouch; and (3) frequently balance and stoop.  (*Id*.)  Dr. Perencevich concluded White had unlimited push/pull capacity and no manipulative limitations.  (Tr. 142-43.)  Finally, Dr. Perencevich found White should avoid all exposure to hazards (machinery, heights, etc.) and avoid concentrated exposure to extreme cold and heat, humidity, fumes, odors, dusts, gases, and poor ventilation.[4]  (Tr. 143.)

**D.  Hearing Testimony**

During the January 28, 2015 hearing, White testified to the following:

- She lives alone and does not drive.  (Tr. 76-77.)  She has three sisters, a brother,

---

[4] Additionally, on May 10, 2013, White underwent a consultative psychological examination with Herschel Pickholtz, Ed.D.  (Tr. 911-917.)  White reported suffering from depression and anxiety.  (*Id*.)  Dr. Pickholtz diagnosed (1) depressive disorder, not otherwise specified, mild; (2) adjustment disorder with mild anxiety secondary to health issues; and (3) mixed substance abuse in remission.  (Tr. 916.)  He found her capacities to understand, remember, and carry out instructions were not impaired.  (Tr. 917.)  In addition, Dr. Pickholtz concluded White's capacities to relate to coworkers and others "seem to fall within the slight range of impairment at worst."  (*Id*.)  Finally, Dr. Pickholtz found White's "capacities to handle the stresses and pressures of work based upon recent work functioning and the mild severity of her current affective complaints falls within the slight range of impairment at worst."  (*Id*.)

and friends who help her with chores.  (*Id*.)

- She worked from 2006 to 2012 as a telemarketer.  (Tr. 80.)  This job entailed a great deal of typing and using a computer mouse.  (*Id*.)  Over the years, she "just got slower and slower and slower" and less accurate.  (*Id*.)  She was laid off in 2012 because she "got so slow."  (Tr. 81.)  The company folded shortly thereafter, and she received unemployment compensation.  (*Id*.)  She tried to find another job but got no interviews or callbacks.  (Tr. 82.)  She also attended a job training program but "after they found out how sick I was, it was like, it's going to be hard to try to find you something to get into."  (*Id*.)  She has not worked since January 2012.  (Tr. 79.)

- Her biggest health problem is the arthritis in her hands.  (Tr. 82-83.)  When she gets up in the morning, her hands are numb and her joints are swollen.  (Tr. 83.)  She cannot make a fist, hold a glass, or comb her hair.  (*Id.*)  She puts her hands in warm water, or uses plastic gloves with Vaseline to "sweat them so that I can get heat into my joints so that I can get in the shower sometimes and wash up."  (*Id*.)  Cold weather makes her hands worse.  (Tr. 84.)

- She has had this problem with her hands for the past six years.  (Tr. 83.)  It has gotten progressively worse over time.  (*Id*.)  She has trouble with buttons and zippers, and only wears clothes that she can pull on.  (Tr. 83-84.)  She drops things often and uses paper cups and plates to avoid dropping glassware.  (Tr. 88-89.)  Her best friend comes over to do her hair for her.  (Tr. 85.)

- She also suffers from liver disease, diabetes, sleep apnea, and psoriasis.  (Tr. 89-92.)  She gets Stelara injections and takes Tramadol for her conditions.  (Tr. 86.)  She cannot take NSAIDs because of her liver disease.  (Tr. 89-90.)  She uses a CPAP machine for her sleep apnea, and has also used an oxygen machine at night.  (Tr. 91.)  She has lost 75 pounds, which helps alleviate her knee pain and diabetes but does not help with her psoriasis and arthritis.  (Tr. 90-91.)

- On a typical day, she gets up at 5 a.m. and "sit there and I work myself, get my hands together, I try to move my hands, get my knees together and I get out of the bed."  (Tr. 78.)  She makes breakfast and takes a shower.  (*Id*.)  She cannot use the bathtub because she is not able to climb out of the tub.  (*Id*.)  She gets dressed and spends the rest of the day cleaning and "trying to take good care of my life."  (Tr. 78-79.)  She watches television in the afternoon, and sometimes listens to music.  (Tr. 79.)  She used to be an avid reader, but she now has to have a stand to put a book on.  (*Id*.)  She "cannot hold a book to read a book."  (*Id*.)

- She bakes or boils all of her food.  (Tr. 76, 89.)  She uses a sponge mop and light broom to do housecleaning.  (Tr. 76.)  Her brother takes her to the

22

laundromat and helps with her laundry.  (*Id.*)  Her brother and sister-in-law take her to the grocery store and help with her groceries, because she cannot carry the bags or get them into the house.  (Tr. 77.)

• She can lift no more than five pounds.  (Tr. 88.)  She can stand for 20 to 25 minutes before her hip, leg, or knees will give out.  (Tr. 87.)  She has to use a rolling cart at the store if she has to stand for too long.  (*Id.*)  She can walk for no more than 15 to 20 minutes.  (*Id.*)  She can sit for 15 to 20 minutes "depending on what [her] bowel movement is that day."  (*Id.*)  She recently had an exploratory procedure because "every time I take a bowel movement, I pass out, the pain is so intense."  (Tr. 88.)  She has to watch everything she eats very carefully to minimize the pain.  (*Id.*)

• She does not sleep well at night.  (Tr. 92.)  She does not sleep during the day, but she does lay down.  (*Id.*)  She estimated that she lays down three to four times per week for an hour and a half to two hours each time.  (*Id.*)

The VE testified White had past work as a telephone solicitor.  (Tr. 94.)  The ALJ then posed the following hypothetical question:

First off, I would like you to consider a person with the same age, education, and past work as the claimant who is able to occasionally lift and carry 20 pounds and frequently lift and carry 10 pounds.  Is able to stand and walk two hours of an eight hour workday.  Is able to sit for six hours of an eight hour workday.  Would have unlimited push and pull other than shown for lift and/or carry.  Could occasionally climb ramps and stairs.  Could never climb ladders, ropes or scaffolds.  Could frequently balance and stoop.  Could occasionally kneel and crouch.  Could never crawl.  In addition this individual must avoid concentrated exposure to extreme cold and extreme heat and avoid concentrated exposure to humidity.  This individual must avoid concentrated exposure to fumes, odors, dust, gases, and poor ventilation and must avoid all exposure to hazards meaning unprotected heights and fast moving machinery.  Given such a hypothetical individual would this hypothetical individual be able to perform the claimant's past work as those occupations are either generally or actually performed?

(Tr. 94-95.)

The VE testified the hypothetical individual would be able to perform White's past work as a telephone solicitor, both as generally and actually performed.  (Tr. 95.)  The ALJ then asked a second hypothetical that was the same as the first, but added the limitation that the individual

23

can perform frequent handling and fingering bilaterally.  (*Id*.)  The VE testified such an individual could perform White's past work as generally and actually performed.  (*Id*.)

The ALJ then asked a third hypothetical that was the same as the first but added the limitation that the individual could perform occasional handling and fingering bilaterally.  (Tr. 95-96.)  The VE testified such an individual would not be able to perform White's past work as a telephone solicitor.  (Tr. 96.)  He also testified that there would be no transferable skills from her past work.  (*Id*.)

### III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).1

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs*., 667 F.2d 524 (6ᵗʰ Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4).  *See also Ealy v.*

*Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010);  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience.  *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d).   Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and*  416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, White was insured on her alleged disability onset date, July 1, 2012, and remained insured through December 31, 2016, her DLI.  (Tr. 51.)  Therefore, in order to be entitled to POD and DIB, White must establish a continuous twelve month period of disability commencing between these dates.  Any discontinuity in the twelve month period precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2016.

2.    The claimant has not engaged in substantial gainful activity since July 1, 2012, the alleged onset date (20 CFR 404.1571 et seq., and 416.971 et seq.)

3.    The claimant has the following severe impairments: Diabetes mellitus, obesity, psoriatic arthritis, osteoarthritis, and allergic rhinitis (20 CFR 404.1520(c) and 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform work as defined in 20 CFR 404.1567(b) and 416.967(b) except that she can occasionally lift and carry 20 pounds and frequently lift and carry 10 pounds; she is able to stand and walk 2 hours of an 8-hour workday; and she is able to sit for 6 hours of an 8-hour workday.  Additionally, she can perform unlimited pushing and pulling other than shown for lifting and/or carrying; she can occasionally climb ramps and stairs; but never climb ladders, ropes and scaffolds; she can frequently balance and stoop; and she can occasionally kneel and crouch, but she can never crawl.  She must avoid concentrated exposure to extreme cold and extreme heat; she must avoid concentrated exposure to humidity, fumes, odors, dusts, gases, and poor ventilation; she must avoid all exposure to hazard, such as unprotected heights and fast moving machinery; and she is limited to frequent handling and fingering bilaterally.

6.    The claimant is capable of performing past relevant work as a sales representative telemarketing.  This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7.    The claimant has not been under a disability, as defined in the Social Security Act, from July 1, 2012, through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

(Tr. 51-62.)

26

### V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)."  *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011).  Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.")  This is so because there is a "zone of choice"

27

within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

### Treating Physicians Drs. Redahan and Ryan

In her first assignment of error, White argues the ALJ improperly evaluated the

28

opinions of treating physicians, Drs. Redahan and Ryan.  (Doc. No. 12.)  She asserts the ALJ

failed to first assess whether these physicians' opinions were entitled to "controlling weight,"

i.e., whether they were well-supported and not inconsistent with other substantial evidence in the

record.  White then maintains the ALJ failed to evaluate the relevant factors under 20 CFR

404.1527(d)(2), noting the ALJ's entire discussion of Dr. Redahan's opinion consisted of only

one sentence.  White argues the ALJ "misrepresented the evidence of record" by discounting

treatment notes indicating ongoing hand, knee and hip pain.  Finally, White asserts the ALJ

"compounded her failure to perform an appropriate review of the treating physician statement"

by giving "significant weight" to the opinions of state agency physicians Drs. Gorniak and

Perencevich, which were issued twenty months prior to the ALJ decision and, therefore,

outdated.

   The Commissioner argues the ALJ properly afforded limited weight to Dr. Redahan's

opinion.[5]  (Doc. No. 14.)  She argues "the ALJ implicitly declined to give controlling weight to

Dr. Redahan's treating source opinion by giving it limited weight, and she gave good reasons by

attacking the consistency of that opinion and indirectly attacking the supportability as required

by 20 CFR § 404.1527."  (*Id*. at 21.)  The Commissioner further asserts that "much of the other

evidence the ALJ relied on throughout the opinion contradicted Dr. Redahan's extreme

limitations."  (*Id*. at 22.)  Lastly, the Commissioner maintains the ALJ was entitled to rely on the

opinions of the state agency physicians, pointing out the ALJ expressly addressed later treatment

_____

[5]  The Commissioner argues "White has waived any conflict surrounding the ALJ's
analysis of Dr. Ryan's treating source opinion" because she "merely mentions Dr. Ryan's
name in the first paragraph of Section I, but then fails to argue why the ALJ's analysis
was not sufficient."  (Doc. No. 14 at 20.)

notes which indicated improvement of White's conditions.  Thus, the Commissioner argues "any shortcomings in the state agency physicians' opinions was remedied by the ALJ's thorough review of the record."  (*Id*. at 24.)

A treating source opinion must be given "controlling weight" if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 877 (6th Cir. 2007).  However, "a finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected."  *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009) (quoting Soc. Sec. Rul. 96-2p, 1996 SSR LEXIS 9 at *9); *Meece v. Barnhart*, 2006 WL 2271336 at * 4 (6th Cir. Aug. 8, 2006) (Even if not entitled to controlling weight, the opinion of a treating physician is generally entitled to more weight than other medical opinions.)  Indeed, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927."  *Blakley*, 581 F.3d at 408.[6]

If the ALJ determines a treating source opinion is not entitled to controlling weight, "the

---

[6] Pursuant to 20 C.F.R. § 404.1527(c)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007) (quoting Soc. Sec. Ruling 96-2p, 1996 SSR LEXIS 9 at * 5).  *See also Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013).  The purpose of this requirement is two-fold.  First, a sufficiently clear explanation "'let[s] claimants understand the disposition of their cases,' particularly where a claimant knows that his physician has deemed him disabled and therefore 'might be bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.'" *Id.* (quoting *Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 544 (6th Cir. 2004)).  Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Wilson*, 378 F.3d at 544.  Because of the significance of this requirement, the Sixth Circuit has held that the failure to articulate "good reasons" for discounting a treating physician's opinion "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.[7]

Nevertheless, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence.  *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley*, 581

---

[7] "On the other hand, opinions from nontreating and nonexamining sources are never assessed for 'controlling weight.'  The Commissioner instead weighs these opinions based on the examining relationship (or lack thereof), specialization, consistency, and supportability, but only if a treating-source opinion is not deemed controlling.  20 C.F.R. § 404.1527(c).  Other factors 'which tend to support or contradict the opinion' may be considered in assessing any type of medical opinion.  *Id.* § 404.1527(c)(6)." *Gayheart*, 710 F.3d at 376.

F.3d at 406.  The ALJ is not bound by conclusory statements of a treating physician that a claimant is disabled, but may reject such determinations when good reasons are identified for not accepting them.  *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984); *Duncan v. Secretary of Health & Human Servs.*, 801 F.2d 847, 855 (6th Cir. 1986); *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir. 1984).  According to 20 C.F.R. § 404.1527(d)(1), the Social Security Commissioner makes the determination whether a claimant meets the statutory definition of disability.  This necessarily includes a review of all the medical findings and other evidence that support a medical source's statement that one is disabled.  "A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled."  *Id*.  It is the Commissioner who must make the final decision on the ultimate issue of disability.  *Duncan*, 801 F.2d at 855; *Harris*, 756 F.2d at 435; *Watkins v. Schweiker*, 667 F.2d 954, 958 n. 1 (11th Cir. 1982).

Here, at step two, the ALJ found White suffered from the severe impairments of diabetes mellitus, obesity, psoriatic arthritis, osteoarthritis, and allergic rhinitis.  (Tr. 53.)  After finding her impairments did not meet or medically equal a Listing at step three, the ALJ went on at step four to find that White's statements regarding the intensity, persistence, and limiting effects were not entirely credible for a variety of reasons.  (Tr. 58.)  In particular, the ALJ noted as follows:

> In terms of the claimant's alleged inability to lift, the weight of the evidence shows that she is able to lift pans for cooking and her joint pain improved with Stelara. * * * She reported difficulty with sitting, but this is not supported by the record.  She recently had an eruption of lichenoid dermatitis in the genital area, but this is treatable with medication.  The claimant testified to reduced grip strength and swelling, but examinations generally indicated tenderness without substantial swelling.  (Exhibit 8F-97; 10F-18; 3F-84, 57; 5F-32.)  She was referred to the nutrition clinic regarding weight loss and

other medical problems but she reported that she was too busy to make an appointment (Exhibit 5F-82).  However, after pursuing lifestyle changes and weight loss, in addition to dietary changes for diabetes, she had significant improvements in many of her impairments. * * * **Her treating doctors indicate that she can perform a range of least sedentary work (Exhibit 7F, 14F).  Although the undersigned finds that the claimant is not as limited as opined by these treating sources, these opinions show that she is not precluded from all work. * * * Treatment notes show significant improvement in her psoriatic arthritis, trochanteric bursitis, and diabetes mellitus with medication, injections, and weight loss (Exhibit 13F-1, 55, 24, 59; 8F-68.)  She is able to complete many activities of daily living, including cooking, and household chores (Exhibit 4E).  She reported bowling, using Wii, biking and walking.  (Exhibit 11F-1, 13F-24).**

(Tr. 58) (emphasis added).

The ALJ then thoroughly discussed the medical evidence regarding White's psoriatic arthritis, osteoarthris, and diabetes.  (Tr. 58-60.)  The ALJ noted the June 2012 x-ray of White's knees showing moderate to severe degenerative changes of her patellofemoral joint, as well as treatment notes documenting her struggles with psoriasis on her hands and feet, joint pain, and diabetes.  (*Id*.)  However, the ALJ also noted medical evidence documenting White's subsequent improvement with medication and lifestyle changes.  (*Id*.)  In particular, she discussed treatment notes showing continuing improvement of White's psoriasis and hand pain with Stelara, as well as records showing full muscle strength and no edema.  (*Id*.)

The ALJ weighed the opinion evidence as follows:

On July 29, 2013, Anita Redahan, M.D., opined that the claimant could lift up to 10 pounds occasionally and 5-10 pounds frequently; stand and walk for 15 to 20 minutes at a time and for 2 hours in an 8 hour workday; and she could sit for 1 hour at a time and 4-8 hours in an 8 hour workday.  (Exhibit 7F).  Dr. Redahan further opined that the claimant could rarely climb, balance, stoop, crouch, crawl and kneel; she could occasionally reach, push/pull, and perform fine and gross manipulation; and she had environmental restrictions with regard to heights, moving machinery, temperature extremes, and pulmonary irritants.  (*Id*.)  Additionally, she needed to elevate her legs 45 degrees at will.  (*Id*.)  **The undersigned gives limited weight to this opinion because the**

33

**record does not show any deficits in upper extremity strength at this time or edema in the lower extremities (Exhibit 8F-67.)**

> \* \* \*
>
> On December 19, 2014, Martin Ryan, M.D., opined that the claimant had limitations in lifting/carrying and standing/walking, but these were not assessed; she had no limitations in sitting; and she could rarely climb, balance, stoop, crouch, kneel and crawl (Exhibit 14F).  Dr. Ryan further opined that the claimant could frequently perform fine and gross manipulation, but only occasionally reaching, pushing, and pulling, and she had moderate pain that interfered with her concentration, caused absenteeism, and took her off task. (*Id.*)  **The undersigned gives limited weight to this opinion because the record supports finding that the claimant has some mild findings in her hands to support limitations with fingering and handling, and knee and hip tenderness that could result in occasional kneeling, crouching and stair and ramp climbing; but there were few objective findings to support reaching, pushing, and pulling limitations or mental limitations.**

(Tr. 60-61) (emphasis added).  The ALJ gave "significant weight" to the opinions of Drs. Gorniak and Perencevich "because, the weight of the evidence shows osteoarthritis of the knees with psoriatic arthritis of the upper extremities that could reasonably limit her ability to stand and walk to two hours; and her ability to handle and finger to frequently."  (Tr. 61.)

The ALJ assessed the following RFC:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform work as defined in 20 CFR 404.1567(b) and 416.967(b) except that she can occasionally lift and carry 20 pounds and frequently lift and carry 10 pounds; she is able to stand and walk 2 hours of an 8-hour workday; and she is able to sit for 6 hours of an 8-hour workday.  Additionally, she can perform unlimited pushing and pulling other than shown for lifting and/or carrying; she can occasionally climb ramps and stairs; but never climb ladders, ropes and scaffolds; she can frequently balance and stoop; and she can occasionally kneel and crouch, but she can never crawl.  She must avoid concentrated exposure to extreme cold and extreme heat; she must avoid concentrated exposure to humidity, fumes, odors, dusts, gases, and poor ventilation; she must avoid all exposure to hazard, such as unprotected heights and fast moving machinery; and she is limited to frequent handling and fingering bilaterally.

34

(Tr. 56-57.)

In determining whether the ALJ properly evaluated the opinions of Drs. Redahan and Ryan, the Court first notes the ALJ's RFC adopted (or was not inconsistent with) many of the specific functional limitations assessed by these physicians.[8]  For example, the RFC is consistent with Dr. Ryan's assessment that White's ability to sit is not affected by her impairments, as well as his opinions that White can (1) frequently engage in fine and gross manipulation, and (2) does not need to elevate her legs at will or a sit/stand option.  Moreover, as Dr. Ryan did not assess White's abilities to lift, carry, stand, or walk, it cannot be said that the RFC is inconsistent with his opinion in those areas.  With regard to Dr. Redahan's opinion, the RFC is consistent with Dr. Redahan's assessments that White can lift and carry up to 10 pounds frequently, stand/walk for a total of 2 hours in an 8 hour workday, and sit for a total of 4 to 8 hours in an 8 hour workday. Moreover, the RFC adopted both Dr. Redahan's and Dr. Ryan's opinions with regard to White's environmental restrictions.

The RFC conflicts, however, with Dr. Redahan's opinions that White can lift 10 pounds occasionally; can only occasionally engage in fine and gross manipulation; must elevate her legs 45 degrees at will; and can only stand/walk for 15 to 20 minutes without interruption and sit for only 1 hour without interruption (which is essentially an opinion that White requires a sit/stand at

_____

[8] It is undisputed that both Dr. Redahan and Dr. Ryan constituted "treating physicians" when they rendered their opinions regarding White's physical functional capacity.  At the time Dr. Redahan completed her July 2013 opinion, she had treated White for over a year and seen her on at least five occasions.  (Tr. 902-906, 868-870, 836-839, 798-801, 1112-1118.)  Similarly, Dr. Ryan had treated White for eleven months and seen him on five occasions when he rendered his December 2014 opinion.  (Tr. 1235-1244,1358-1362, 1386-1388, 1407-1410, 1476.)

will option).  The RFC also conflicts with both physicians' opinions regarding White's postural restrictions and abilities to push/pull.  In determining whether the ALJ erred in her evaluation of the opinions of Drs. Redahan and Ryan, the Court focuses on only those aspects of these physicians' opinions that were, in fact, rejected by the ALJ in fashioning the RFC.

### Dr. Redahan

With regard to Dr. Redahan's opinion, the Court finds the ALJ did not err in assigning less than controlling weight to those portions of her opinion that were not incorporated into the RFC.  In assigning "limited weight" to Dr. Redahan's opinion, the ALJ addressed the consistency and supportability of the opinion, noting it conflicted with record evidence that failed to show any deficits in upper extremity strength or edema in White's lower extremities.  (Tr. 60.)  The Court agrees that, taken alone, it would be questionable whether this statement satisfied the "good reasons" requirement of the treating physician rule.  Reading the ALJ decision as a whole, however, it is clear the ALJ thoroughly evaluated the evidence and indicated the weight the ALJ gave it.  This provides a sufficient basis for the ALJ's decision to give only "limited" weight to Dr. Redahan's opinion, *see Nelson v. Comm'r of Soc. Sec*., 195 Fed. Appx 462, 470–71 (6th Cir. 2006), and affords this Court the opportunity to meaningfully review the ALJ's opinion.

In *Nelson*, the ALJ failed to discuss the opinions of two of the plaintiff's treating physicians, and the plaintiff argued this failure constituted a basis for remand.  The Sixth Circuit disagreed, concluding "the ALJ's evaluation of [the plaintiff's] mental impairments indirectly attacks both the supportability of [the treating physicians'] opinions and the consistency of those opinions with the rest of the record evidence."  *Nelson*, 195 F. Appx at 470.  Because the ALJ's discussion of the other evidence "implicitly provided sufficient reasons for not giving ...

36

controlling weight" to the treating physicians, the Sixth Circuit concluded  the ALJ's decision satisfied the purposes of the controlling physician rule.  *Id*. at 472.  *See also Dutkiewicz v. Comm'r of Soc. Sec.,* 663 Fed. Appx. 430, 432 (6th Cir. 2016) ("But the ALJ's failure to explicitly consider Dr. Kolinski's opinion was, at most, harmless error because the ALJ indirectly rejected the conclusion that Dutkiewicz was unable to work by reasonably explaining that the majority of medical evidence, the nature of Dutkiewicz's treatment, and the other medical opinions in the record showed that Dutkiewicz had the capacity to perform a limited range of sedentary work.");  *Coldiron v. Comm'r of Soc. Sec*., 391 Fed. Appx. 435, 440-441 (6th Cir. 2010) ("An ALJ may accomplish the goals [of the "treating physician" rule] by indirectly attacking the supportability of the treating physician's opinion or its consistency with other evidence in the record.");  *Brock v. Comm'r of Soc. Sec*., 368 Fed. Appx. 622, 625 (6th Cir. 2010) ("Additionally, the administrative law judge's findings challenge the supportability and consistency of Dr. Moore's diagnoses with the other evidence in the record in an indirect but clear way, as was the case in *Nelson v. Comm'r of Soc. Sec*., 195 Fed. Appx. 462 (6th Cir. 2006)).

In this case, the ALJ provided a lengthy discussion of the medical evidence before evaluating the opinions of Dr. Redahan and the other medical opinions contained in the record. (Tr. 57-61.)  The ALJ's discussion of the evidence was not merely a rote recitation of White's longitudinal history; rather, the ALJ analyzed the medical evidence and explained how it supported her ultimate RFC determination.  (*Id*.)  For example, the ALJ discussed the following evidence, which implicitly rejects those portions of Dr. Redahan's opinion that were not incorporated into the RFC:

- The ALJ discussed evidence related to White's physical impairments that was inconsistent with the limitations Dr. Redahan assigned.  In

particular, the ALJ cited specific treatment notes showed significant improvement in White's psoriatic arthritis, trochanteric bursitis, and diabetes with medication, injections, and weight loss.  (Tr. 58-60.)  The ALJ cited the following treatment notes in the decision:

- A February 2013 treatment note indicating White's psoriasis remained under good control except for her scalp and hands which were normally controlled with additional topical medications.  (Tr. 59.)

- A February 2014 treatment note indicating White reported improvement with Stelara and no new skin concerns.  Examination on that date revealed few hyperpigmented plaques with only mild erythema involving the palms, dorsal hands, elbows, and knees.  (Tr. 60.)

- A May 2014 treatment note showing continuing improvement in White's psoriasis and hand pains.  (Tr. 60.)

- Treatment notes from June 2014 indicating White had few hyperpigmented plaques with mild erythema involving the palms, full muscle strength, and protective and vibratory sensation intact to her lower extremities.  (Tr. 60.)

- A September 2014 treatment note stating White reported no real joint pain at that time or edema.  (Tr. 60.)

- The ALJ found White's self-reported difficulties with sitting, lifting, and use of her hands were not supported by the record.  With regard to lifting, the ALJ found "the weight of the evidence shows that she is able to lift pans for cooking and her joint pain improved with Stelara."  (Tr. 58.)  With regard to White's ability to sit, the ALJ noted White had recently suffered an eruption of lichenoid dermatitis but found this condition was treatable with medication.  (*Id*.)  With regard to White's complaints of reduced grip strength and swelling, the ALJ noted her examinations "generally indicated tenderness without substantial swelling."  (*Id*.)

- The ALJ discussed evidence demonstrating White initially refused services at the nutrition clinic regarding weight loss and other problems, claiming she was "too busy" to make an appointment.  (*Id*.)  The ALJ noted that, once White committed to lifestyle changes including dietary restrictions and exercise, "she had significant improvements in many of her impairments."  (*Id.*)  In particular, the

38

ALJ noted White was able to stop taking diabetes medication and did not report further sleep apnea symptoms.  (*Id*.)  *See also* Tr. 60.

• The ALJ noted White was able to complete many activities of daily living, including cooking and household chores.  (*Id*.)  The ALJ also cited treatment notes indicating White reported bowling, using the Wii for exercise, biking, and walking.  (*Id*.)

Had the ALJ discussed the aforementioned evidence immediately after stating she was giving "limited weight" to Dr. Redahan's opinion, there would be no question the ALJ provided "good reasons" for giving it less than controlling weight.  The fact that the ALJ did not analyze the medical evidence for a second time (or refer to her previous analysis) when assessing Dr. Redahan's opinion does not necessitate remand of White's case.  *See e.g., Ellis v. Comm'r of Soc. Sec*., 2015 WL 6444319 at * 15-16 (N.D. Ohio Oct. 23, 2015); *Hanft v. Comm'r of Soc. Sec*., 2015 WL 5896058 at * 9 (N.D. Ohio Oct. 8, 2015); *Daniels v. Comm'r of Soc. Sec*., 2014 WL 1304940 at * 4 (N.D. Ohio March 27, 2014) ("There is no magic language that an ALJ must use to show that he or she has considered the factors in 20 CFR § 404.1527.  Rather, the ALJ must set forth his or her supporting reasoning, based on evidence in the record, to allow for meaningful judicial review.")  "No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result."  *Shkabari v. Gonzales*, 427 F.3d 324, 328 (6th Cir. 2005) (quoting *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989)).  *See also Kobetic v. Comm'r of Soc. Sec*., 114 Fed. Appx 171, 173 (6th Cir. 2004 ) (When "remand would be an idle and useless formality," courts are not required to "convert judicial review of agency action into a ping-pong game.") (quoting *NLRB v. Wyman–Gordon Co.*, 394 U.S. 759, 766, n. 6, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969) ).

White nonetheless complains the ALJ erred by assigning "great weight" to the opinions

39

of state agency physicians Drs. Gorniak and Perencevich, which were issued well prior to the ALJ's decision.  This argument is without merit.  An "ALJ's decision to accord greater weight to state agency physicians over [claimant's] treating sources [is] not, by itself, reversible error." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409 (6th Cir. 2009).  Here, the ALJ clearly explained that she found the state agency physicians' opinions were supported by the weight of the evidence, which was outlined at length earlier in the decision.  White correctly notes that Dr. Gorniak's and Dr. Perencevich's opinions were completed in April and August 2013, respectively, many months prior to the April 2015 ALJ decision.  However, "[t]here is no categorical requirement that the non-treating source's opinion be based on a 'complete' or 'more detailed and comprehensive' case record."  *Helm v. Comm'r of Soc. Sec.*, 2011 WL 13918 at * 4 (6th Cir. Jan. 4, 2011).  Rather, the Sixth Circuit requires only "some indication that the ALJ at least considered [later treatment records] before giving greater weight to an opinion that is not 'based on a review of a complete case record.'"  *Blakley*, 581 F.3d at 409 (quoting *Fisk v. Astrue*, 253 Fed. Appx. 580, 585 (6th Cir. 2007)).  *See also Kepke v. Comm'r of Soc. Sec.*, 636 Fed. Appx. 625, 632 (6th Cir. 2016) (stating *Blakley* requires "only that before an ALJ accords significant weight to the opinion of a non-examining source who has not reviewed the entire record, the ALJ must give 'some indication' that he 'at least considered' that the source did not review the entire record. . .  In other words, the record must give some indication that the ALJ subjected such an opinion to scrutiny.")  Here, the ALJ explicitly addressed treatment notes post-dating the state agency opinions, including multiple notes indicating improvement of White's conditions with Stelara, dietary changes, weight loss, and exercise.  (Tr. 60.)  Moreover, it is clear the ALJ subjected the state agency opinions to scrutiny as the RFC provided greater manipulative

restrictions than set forth in either Dr. Gorniak's or Dr. Perencevich's opinions.  (Tr. 106-108, 141-143.)  Under these circumstances, it was within the ALJ's discretion to give greater weight to the opinions of the state agency physicians over the opinions of White's treating sources.

In sum, the medical and opinion evidence, as analyzed by the ALJ in her opinion, provides substantial evidence for the ALJ's conclusion that White was not as limited as Dr. Redahan's July 2013 opinion suggested.[9]  Reading the decision as a whole, the Court finds the ALJ satisfied the requirements of the "treating physician" rule and provided good reasons for discounting Dr. Redahan's option.  White's argument to the contrary is without merit.

### Dr. Ryan

For the same reasons, the Court further finds the ALJ properly evaluated and discounted the portions of Dr. Ryan's December 2014 opinion that were not adopted by the RFC.  The ALJ rejected several of Dr. Ryan's assessed limitations "because the record supports finding that the claimant has some mild findings in her hands to support limitations with fingering and handling, and knee and hip tenderness that could result in occasional kneeling, crouching and stair and ramp climbing; but there were few objective findings to support reaching, pushing, and pulling limitations or mental limitations."  (Tr. 61.)

While this statement standing alone might not be sufficient to satisfy the requirements of the "treating physician" rule, the Court finds the ALJ's thorough discussion of the medical evidence earlier in the decision implicitly rejects Dr. Ryan's functional assessments that were not

---

[9] In this regard, the Court notes the ALJ cited many treatment notes post-dating Dr. Redahan's July 2013 opinion that showed significant improvement in White's condition. Thus, the ALJ appeared to recognize that Dr. Redahan's July 2013 assessment did not reflect White's subsequent improvement with treatment and lifestyle changes.

41

incorporated into the RFC.  Indeed, the particular evidence discussed in the ALJ decision (as outlined *supra* in connection with the Court's discussion of the ALJ's rejection of Dr. Redahan's opinion) also provides substantial evidence for the ALJ's rejection of those portions of Dr. Ryan's opinion that are not reflected in the RFC.

Accordingly, the Court finds the ALJ met her burden of offering good reasons to support her decision to assign less than controlling weight to Dr. Ryan's December 2014 opinion. White's first assignment of error, therefore, is without merit and does not provide a basis for remand.[10]

### RFC Assessment

White next argues "the ALJ's assessment that [she] is capable of lifting and carrying 20 pounds occasionally, 10 pounds frequently, and perform unlimited pushing and pulling is unsupported by this record."  (Doc. No. 12 at 17.)  She maintains it is "contrary to logic" that the ALJ limited White to frequent handling and fingering, but assessed no limitation for pushing and pulling, "which obviously requires use of the hands."  (*Id*.)  She asserts, summarily, that "you cannot push and pull without using your hands– so if you are limited in the use of your hands, you

---

[10] The Court rejects White's argument that remand is required because the ALJ failed to first assess whether Dr. Redahan's and Dr. Ryan's opinions were entitled to "controlling weight," before finding they were entitled to "limited weight."  Both opinions were entitled to "limited weight" for the same reasons that they were not entitled to controlling weight.  *See e.g. Harper v. Comm'r of Soc. Sec*., 2014 WL 4626018 at * 4 (S.D. Ohio Sept. 15, 2014).  As discussed above, the ALJ provided a thorough discussion of the medical evidence relating to White's physical impairments earlier in the decision, which implicitly rejected both Dr. Redahan's and Dr. Ryan's assessments.  In so doing, the ALJ satisfied the good reasons rule, which is met when an ALJ's decision allows for adequate review and a claimant can discern the rationale for an unfavorable decision.  The fact that the ALJ did not first state that these opinions were not entitled to controlling weight before explaining that they were only entitled to "limited weight" is not grounds for remand.

are limited in pushing and pulling." (*Id*. at 19.)  Finally, White argues the medical record and the opinions of Drs. Redahan and Ryan support "much greater limitations than those assessed by the ALJ."  (*Id*. at 17.)

The Commissioner maintains the RFC is supported by substantial evidence.  (Doc. No. 14.)  She notes the ALJ focused on the medical evidence in assessing White's functional limitations, including treatment notes showing improvement in White's joint pain and psoriasis, examination findings indicating the lack of swelling in her hands, and improvement in her diabetes and sleep apnea with weight loss and exercise.  (*Id.*)  The Commissioner further asserts the ALJ's RFC is supported by the opinions of state agency physicians Drs. Gorniak and Perencevich.  Finally, the Commissioner argues that "it is entirely reasonable for the ALJ to determine, based upon the medical records, that White's psoriasis on her hands would prevent unlimited fine manipulation, while determining it would not limit gross manipulation such as pushing and pulling, which do not require small detailed movements and accuracy."  (*Id*. at 18.)

The RFC determination sets out an individual's work-related abilities despite his or her limitations.  *See* 20 C.F.R. § 416.945(a).  A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner.  *See* 20 C.F.R.§ 416.927(d)(2).  An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner."  *See* 20 C.F.R.§ 416.927(d)(3).  As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all of the relevant evidence, 20 C.F.R. § 416.946(C), and must consider all of a claimant's medically determinable impairments, both individually and in combination, S.S.R. 96-8p.

"In rendering his RFC decision, the ALJ must give some indication of the evidence upon

43

which he is relying, and he may not ignore evidence that does not support his decision, especially

when that evidence, if accepted, would change his analysis." *Fleischer v. Astrue*, 774 F. Supp.2d

875, 880 (N.D. Ohio 2011) (citing *Bryan v. Comm'r of Soc. Sec.*, 383 Fed. Appx. 140, 148 (3rd

Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a

residual functional capacity determination,' and must also 'mention or refute [...] contradictory,

objective medical evidence' presented to him.")).  *See also* SSR 96–8p, at *7, 1996 SSR LEXIS

5, *20 ("The RFC assessment must always consider and address medical source opinions.  If the

RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain

why the opinion was not adopted.")).  While the RFC is for the ALJ to determine, however, it is

well established that the claimant bears the burden of establishing the impairments that determine

his RFC.  *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).

   The Court finds the RFC is supported by substantial evidence.  As noted above, the ALJ

fully discussed White's hearing testimony and the medical evidence regarding her physical

impairments, including her hand pain and psoriasis.  (Tr. 58-60.)  The ALJ acknowledged

examination findings in 2012 and 2013 of psoriasis of the palms and feet, plaques on the both

hands with pitting and ridges in her nails, pain in her hand joints, hyperpigmentation, and

tendinitis.  (*Id*.)  However, the ALJ discounted the severity of White's symptoms in light of

treatment records throughout 2014 showing improvement in her psoriasis and hand pains, full

muscle strength, intact sensation, and no edema.  (*Id*.)  Finally, the ALJ relied on the opinions of

state agency physicians Drs. Gorniak and Perencevich, both of whom found White could lift and

carry 20 pounds occasionally and 10 pounds frequently, and had unlimited push/pull capacity.

(Tr. 61.)  While these state agency physicians found White had no manipulative restrictions, the

ALJ credited Dr. Ryan's opinion that White should be limited to frequent handling and fingering.

Substantial evidence supports the RFC. As discussed at length *supra*, treatment records from 2014 show consistent improvement in White's psoriasis and hand pain after she switched to Stelara. *See e.g.*, Tr. 1245-1246, 1255, 1328-1331, 1353, 1389-1392, 1411-1412. Moreover, while White claims it is "contrary to logic" for the RFC to limit her to frequent handling and fingering but assess an unlimited capacity for pushing and pulling, she cites no legal authority for the position that these restrictions are necessarily contradictory. As noted above, both Drs. Gorniak and Perencevich opined White had an unlimited capacity for pushing and pulling, and Dr. Ryan found she had the capacity to engage in frequent fine and gross manipulation. (Tr. 1489-1490.)

Although White cites evidence from the record that she believes supports a more restrictive RFC, the findings of the ALJ "are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion." *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001). Indeed, the Sixth Circuit has made clear that an ALJ's decision "cannot be overturned if substantial evidence supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). In the instant case, the ALJ clearly articulated her reasons for finding White capable of performing work as set forth in the RFC and these reasons are supported by substantial evidence. Accordingly, White's argument that the ALJ erred in formulating the RFC is without merit.

## VII.   CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.


_s/ Jonathan D. Greenberg_
Jonathan D. Greenberg
United States Magistrate Judge

Date: March 1, 2017

### OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See _United States v. Walters_, 638 F.2d 947 (6th Cir. 1981); _Thomas v. Arn_, 474 U.S. 140 (1985), _reh'g denied_, 474 U.S. 1111 (1986).**